**SMITH-DOUGLAS CO., Inc.**

v.

**UNITED STATES.**

No. 46289.

United States Court of Claims.
Dec. 1, 1953.

Clement C. Rinehart, New York City, and Harold A. Kertz, Washington, D. C., for plaintiff. Charles B. McInnis, Roger H. Muzzall, and Roberts & McInnis, Washington, D. C., were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant. John B. Miller, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

On December 6, 1948, the court entered judgment for the plaintiff in this suit for just compensation for the taking by the Government of the plaintiff's dry-cargo freighter, the *International*. The judgment was based upon a sound condition value of $292,232.18 for the ship on the date of its taking, October 6, 1943. On June 13, 1949 the Supreme Court of the United States decided the case of United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392. The opinion of the Court in that case created a doubt in our minds as to whether, in the valuation which we had placed upon the *International*, there might have been included some amount of enhancement due to "the causes necessitating the taking", which amount should have been excluded, pursuant to Section 902(a) of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242, as that statute was interpreted by the Supreme Court. We, therefore, remanded the case to a commissioner of this court for the purpose of taking evidence on the question of enhancement.

In 1939, before the outbreak of the Second World War, there was a great excess of tonnage of dry-cargo freighters in this country, and in the world. Prices were, consequently, low, averaging some $20 per deadweight ton. They remained so until January 1940, but thereafter they rose spectacularly, although with some temporary downward fluctuations, until June 1941 when the price was about $90 per ton. That was the peak of prices, and from that time they fell back to some $60 per ton in April 1942, after which time there was no free market for such ships.

The consideration that determines what a buyer is willing to give for a ship is the prospect, or lack of prospect, of profitable operation. That depends on the number of ships available, and the amount of cargo available. If there are too many ships for the available cargo, there will be rate-cutting in competition for the business, and underloading. The outbreak of war in Europe in September 1939 gave a prospect of an increase in shipping, and ship prices tended upward. This country passed its neutrality statute in November 1939, barring American-flag ships from belligerent areas, and the prices went down. Operators of American-flag ships adjusted themselves to a new pattern of operation, outside the belligerent areas, and prices went up. But during the period from October 1939 to June 1941, the latter date being the time when prices reached their peak, the United States Maritime Commission permitted the sale to foreigners of some 165 American-flag dry-cargo ships because they were regarded as excess tonnage. As the fighting became more severe, many freighters were lost by sinking or destruction. Between September 1, 1939 and December 31, 1941, 2,612 dry-cargo ships were lost by the nations who became our allies when we entered the war, and by neutrals. By mid-1941, the time when ship prices reached their peak, those losses already amounted to 1,775 ships more than had been replaced by new construction. To the growing scarcity of ships was added the fact that the effectiveness of operation was impaired by war conditions. Slow convoy movements, longer voyages, overstraining of machinery, changes in routing, inspection and certification in connection with blockades, all had adverse effects.

As more of the European countries became involved in the war in 1940, their merchant vessels were removed from commercial operation and from competition with American ships in trade with South America, West, South, and East Africa, the Far East, the Netherlands East Indies, Malaya, and Australia. The business of American ships increased greatly in the trade with all these areas.

The general expansion of business in the United States from 1939 to 1941 increased the demand for and the earnings of freight ships. Pertinent statistics show that gross national product, con-

sumption expenditures, and private investment, increased greatly in this period, and continued to increase throughout the war. Federal Government purchases of goods and services for war purposes also increased in this early period, but the amounts of these purchases were small in comparison with those relating to private business. The profits of all industries, including railroads and water transportation, increased greatly during this period.

Our problem is to determine how much, if any, of the increase in the price of ships which took place after the President's declaration of a limited national emergency on September 8, 1939, 3 C. F.R.Cum.Supp. 114, and before the taking of the *International* on October 6, 1943, was deductible enhancement under the Merchant Marine Act of 1936. The prices of such ships reached their peak in June 1941, and tended downward after that date. The value which we have placed on the plaintiff's ship was substantially lower than the market price of such ships in June 1941. The decline in the price of ships after June 1941 was the result, and the intended result, of the passage of the Ship Warrants Act of July 14, 1941, 55 Stat. 591, which authorized the President to delegate to the Maritime Commission the power to exercise close control over American merchant ships with regard to the trades in which they should engage, the voyages to be undertaken, the class of cargo to be carried, the charter hire to be charged, and other things. By making use of these powers, the Maritime Commission stopped the rise in the price of ships, since owners could no longer pick the most profitable routes or cargo, nor charge the high rates which they had been charging, and the prospects of large earnings no longer existed. Further, in April 1942, the War Shipping Administration ordered the requisition for use, though not for title, of practically the entire ocean-going merchant fleet of the United States. From that time until the requisition for title of the plaintiff's ship

in October 1943, there was, of course, no free market for ships.

We return, then, to the question of how much deductible enhancement there may have been in the price of the *International* in June 1941, which enhancement may have remained in the lower value which we found that the plaintiff's ship had on October 6, 1943. The Government does not claim that there was any enhancement in the value of the ship caused by the Government's previous or prospective taking of ships of a similar type. We have already discussed some of the causes for the rise in the value of merchant ships from 1939 to June 1941. We now consider the activities of the Government during this period, to see whether its activities contributed to the rise in the value of ships. In September 1939, the Maritime Commission had 109 dry-cargo ships in its laid-up fleet. By June 1941, all but 15 of these ships had been put back in use. Forty-seven of these ships were sold to foreigners and were thus made available for competition with American ships. The Maritime Commission, through its official construction program authorized by the Merchant Marine Act of 1936, caused to be built 68 new merchant ships. On June 6, 1941, Congress passed a statute, 55 Stat. 242, authorizing the purchase or requisition of any foreign merchant vessel lying idle within our jurisdiction. Six such ships were requisitioned during the first half of 1941.

All of the above-recited activities of the Government increased the number of available merchant ships and did not contribute to a rise in the prices of ships.

Between September 1939 and the end of April 1941, 50 ships were transferred by the Government from general commercial use to the Army and Navy. Of these, 24 were combination cargo and passenger ships, 22 were dry-cargo freighters and the other 4 were probably tankers. To whatever extent these ships did not, after their transfer to the Army and Navy, carry cargo that had formerly been carried by merchant ships, their

transfer diminished the available supply of merchant ships.

There were activities of the Government in relation to cargo and shipping space which should be considered. Those activities were (a) transportation of military shipments in excess of the capacity of freighters directly under the control of the armed services; (b) importation for civilian account of commodities basic to the national economy in peace or in war, which commodities were designated by the Munitions Board as strategic, critical, or essential; (c) transportation of cargo in the Red Sea lift under the Lend-Lease program; and (d) importation of commodities for Government account for stockpiling purposes.

As to item (a) above, the War Department estimated on February 21, 1941, that commercial freighters would need to carry 1,095,070 tons of cargo for the Department to Panama, Hawaii, the Philippines, Alaska, and our Atlantic bases, in the first half of 1941, in addition to the tonnage of the ships directly under the control of the Department. After that estimate, more ships were, as we have seen above, transferred directly to the War Department. It is, therefore, impossible to determine accurately how much of this Army tonnage was carried by commercial ships.

As to (b) above, there was a substantial increase in the importation into the United States of basic commodities essential for defense or for the normal operation of the civilian economy. The Army and Navy Munitions Board listed and classified these commodities, but all purchases of them were made by civilian importers. The Maritime Commission was, however, assigned the task of assisting civilian importers of these commodities to find shipping space. During the September 1939 to 1941 period here in question, these imports were for the purpose of building up a civilian supply of materials for use in normal trade channels in the manufacture of goods for civilian use or for national defense or for export to countries which we were assisting. The Maritime Commission used strong tactics, described by witnesses as "jawboning" to induce or compel ship operators to carry some of this cargo, which the operators did not want to carry because of the availability of other higher revenue-producing cargo. In view of the general increase in the economic activity of the country during the period in question, it is not possible, on the evidence before us, to determine the extent to which the defense program of the United States or the intervention of the Maritime Commission to find shipping space for civilian importers, increased imports into the United States and thus increased the earnings and prices of ships.

Item (c) listed above, was exportations under Lend-Lease. The Lend-Lease Act, 55 Stat. 31, 22 U.S.C.A. § 411 et seq., was not enacted until March 11, 1941, hence there was only a short period of activity under it before June 1941, the time when ship prices reached their peak. It appears from our finding 19 that only some 123,000 tons of cargo were exported under Lend-Lease during that short period. The carriage of this relatively small amount of cargo would have had no substantial effect upon the market for ships.

Item (d) above was the importation of commodities for Government account for stockpiling purposes. Government corporations, Rubber Reserve Company, Metals Reserve Company and Defense Supplies Corporation caused the importation and stockpiling of rubber, lead, wool, chromium, copper, manganese, tin, zinc, tungsten and tin and zinc ore. While the persons from whom they bought these supplies were contractually bound to find shipping space for them, ship operators were unwilling to carry these bulky commodities because of the availability of higher revenue-producing cargo, and it was necessary for the Government, through the Reconstruction Finance Corporation and the Maritime Commission, to intervene with United States-flag ships to get them to carry these commodities. This pressure did not, of course,

affect favorably the value of the ships directly involved. But the carriage of this cargo for the Government used up some ship space, and no doubt tended to increase the earnings and values of ships generally.

As we have said, the Government, through the means of the Ship Warrants Act of July 14, 1941, supra, deliberately depressed the price and value of merchant ships by controlling their rates, routes, and types of cargo. Within less than a year, prices fell from $88.50 to $60 a ton. What prices in a free market would have been after April 1942 can only be estimated, since in that month the Government requisitioned the use of practically all American-flag merchant ships, thus taking them off the market.

The value of $290,000 which we formerly fixed for the plaintiff's ship and its equipment and spare parts was substantially the April 1942 market value, with some addition because of the better-than-average condition of the ship. That value was, of course, much less than the peak value of such ships in June 1941. Ship values in June 1941 may have been enchanced somewhat by activities which might be regarded as covered by the statutory language "causes which necessitated the taking". The importation of commodities for stockpiling by the Government, and the exportation of Lend-Lease supplies, might be regarded as such activities. But the amounts of such cargo were small, in relation to the total shipping of the period, and the amount of the enhancement would have been small. Then came the Government's deliberate and successful effort to depress the price of ships. Prices fell much more than the amount of any possible enhancement which had theretofore taken place as a result of such activities. It is, of course, possible that, in spite of that fall, the depressed prices may still have contained some small element of enhancement. But our best judgment is that after the severe, and artificially produced, reduction in values which began in July 1941, no substantial amount of such enhancement survived.

We adhere to and reaffirm our former judgment.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.