**AMERICAN-HAWAIIAN STEAM-
SHIP CO.**
v.
**The UNITED STATES.**
Nos. 48720, 48935, 48936, 48940, 49126,
49136, 49141, 49990, 42-52, 43-52.

United States Court of Claims.
July 12, 1955.

Clement C. Rinehart, New York City,
Carl H. Watson, Jr., and Kirlin Campbell
& Keating, New York City, on the briefs,
for plaintiff.

Kendall M. Barnes, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The plaintiff sues to recover just compensation for the requisitioning for title by the defendant of its vessels *Nebraskan, Dakotan, Iowan, Nevadan, Pennsylvanian, Kentuckian, Illinoian, Columbian, Mexican* and *Virginian.* The ten suits were consolidated for trial. The *Pennsylvanian, Illinoian,* and the *Kentuckian* petitions include a cause of action for just compensation for the use of the vessels before their requisition for title. The causes of action for use of these three vessels are being tried separately and are not involved in this decision.

Between December 2, 1942, and May 23, 1946, the War Shipping Administration, acting pursuant to section 902(a) of the Merchant Marine Act of 1936, 49 Stat. 2015, as amended, 46 U.S.C.A. § 1242, requisitioned for title the above named vessels on the dates set forth below:

| Vessel | Date | Hour |
|---|---|---|
| | *1942* | |
| Nebraskan | Dec. 2 | Noon. |
| Dakotan | Dec. 12 | Noon. |
| Iowan | Dec. 26 | Noon. |
| | *1943* | |
| Nevadan | Jan. 17 | 8:00 a. m. |
| | *1944* | |
| Pennsylvanian | June 30 | 10:00 a. m. |
| | *1944* | |
| Illinoian | June 30 | 10:00 a. m. |
| Kentuckian | June 30 | 1:00 p. m. |
| | *1945* | |
| Columbian | Jan. 8 | 4.00 p. m. |
| | *1946* | |
| Mexican | May 14 | Midnight |
| Virginian | May 23 | Midnight |

The plaintiff was tendered as just compensation, exclusive of certain deductions for repairs which we have found were unjustified, the following sums:

| Vessel | Principal amount of tender (excluding interest) | Per deadweight ton |
|---|---|---|
| *Nebraskan* | $744,434.00 | $62.74 |
| *Dakotan* | 670,210.00 | 65.87 |
| *Iowan* | 694,743.00 | 70.10 |
| *Nevadan* | 608,899.00 | 61.67 |
| *Pennsylvanian* | 565,910.00 | 55.62 |
| *Illinoian* | 588,752.00 | 54.41 |
| *Kentuckian* | 432,042.00 | 43.53 |
| *Columbian* | 153,847.77* | 16.21 |
| *Mexican* | 180,830.58* | 13.08 |
| *Virginian* | 158,100.53* | 12.91 |

On April 11, 1945, the War Shipping Administration paid plaintiff 75 percent of the principal amounts of the tenders for seven of the vessels as follows:

| Vessel | Amount of payment on account |
|---|---|
| *Nebraskan* | $558,325.50 |
| *Dakotan* | 502,657.50 |
| *Iowan* | 521,057.25 |
| *Nevadan* | 456,674.25 |
| *Pennsylvanian* | 424,432.50 |
| *Illinoian* | 441,564.00 |
| *Kentuckian* | 324,031.50 |

On January 18, 1949, the Maritime Commission paid plaintiff 75 percent of the principal amounts of the tenders of just compensation for the remaining three vessels as follows:

| Vessel | Amount of payment on account |
|---|---|
| *Columbian* | $115,385.83 |
| *Mexican* | 135,622.95 |
| *Virginian* | 118,575.93 |

The deadweight tonnage, cargo capacity, and the year built, were as follows:

| Vessel | Deadweight tonnage | Cargo capacity | Year built |
|---|---|---|---|
| | *Tons* | *Cubic feet* | |
| *Nebraskan* | 11,960 | 567,240 | 1912 |
| *Dakotan* | 10,175 | 461,923 | 1912 |
| *Iowan* | 10,175 | 461,923 | 1914 |
| *Nevadan* | 10,055 | 575,360 | 1912 |
| *Pennsylvanian* | 10,175 | 461,923 | 1913 |
| *Illinoian* | 10,820 | 531,105 | 1918 |
| *Kentuckian* | 9,925 | 432,165 | 1910 |
| *Columbian* | 9,490 | 384,130 | 1913 |
| *Mexican* | 13,825 | 606,421 | 1907 |
| *Virginian* | 12,250 | 642,694 | 1903 |

The propelling machinery of all the requisitioned ships consisted of reciprocating steam engines and oil-burning boilers of scotch type. All were driven by single screws and were fitted with contra propellers, except the *Mexican* and *Virginian,* both of which had twin screws. The speed in nautical miles per hour of each vessel, the indicated horsepower of its engines, its normal fuel consumption in barrels of fuel oil per day while operating at sea and its "cruising radius," indicating the maximum length of voyage which the vessel could perform without refueling were as follows:

| Vessel | Speed (in knots) | Horsepower (indicated) | Daily fuel consumption (in barrels) | Cruising radius (in nautical miles) |
|---|---|---|---|---|
| *Nebraskan* | 12.2 | 4,000 | 263 | 10,500 |
| *Dakotan* | 12.0 | 4,000 | 229 | 9,200 |
| *Iowan* | 12.0 | 4,000 | 208 | 10,120 |
| *Nevadan* | 11.6 | 3,600 | 238 | 11,050 |
| *Pennsylvanian* | 12.0 | 4,000 | 212 | 9,940 |
| *Illinoian* | 10.8 | 3,300 | 167 | 15,090 |
| *Kentuckian* | 11.9 | 3,000 | 200 | 16,390 |
| *Columbian* | 12.1 | 3,400 | 198 | 19,180 |
| *Mexican* | 11.6 | 4,600 | 303 | 10,950 |
| *Virginian* | 12.1 | 5,200 | 306 | 13,500 |

All the requisitioned ships had three complete cargo decks, except the *Virginian,* which had four decks, and the *Illinoian,* which had two decks. All the ships also had a platform deck or partial deck ("orlop" deck) in No. 1 lower hold, except the *Illinoian, Kentuckian,* and *Virginian.* The cargo hatches of all the requisitioned ships were each equipped with at least two steam winches and two booms (constituting one "set" of cargo gear), and some ships had two "sets" of cargo gear at some hatches. Most of the ships were also equipped with special gear for heavy lifts and special lockers for carriage of valuable cargo.

All of the requisitioned ships had been well maintained and were in seaworthy condition at the time they were requisitioned.

We have recently rendered a decision for plaintiff in a suit for just compensation for the use of one of its vessels, American-Hawaiian Steamship Co. v. United States, 124 F.Supp. 378, 129 Ct. Cl. 365. The legal arguments presented in the former case and the present cases are essentially the same. The proof in the former and present cases is basically the same. Therefore, much of what we said in that case is equally applicable to these cases.

 The general principles appropriate to the ascertainment of just compensation were stated in American-Hawaiian Steamship Co. v. United States, supra, 124 F.Supp. at page 381, 129 Ct.Cl. at page 369, as follows:

" * * * Just compensation has been defined as 'the sum which, considering all the circumstances—uncertainties of the war and the rest— * * * would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.' Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 123–124, 44 S.Ct. 471, 475, 68 L.Ed. 934; Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236. This is but another way of saying that fair market value, where there is a free market, is the usual standard of just compensation. United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707; Olson v. United States, supra, 292 U.S. at page 255, 54 S.Ct. at page 708; Monongahela Navigation Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463; Boom Co. v. Patterson, 98 U.S. 403, 407, 25 L.Ed. 206. Where, for any reason, property has no market, resort must be had to other data to ascertain its value, although this 'involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety.' United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336. The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a 'reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, (Simpson v. Shepard), 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511.' Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890."

During the years 1942 to 1945, inclusive, when eight of the vessels in suit were requisitioned, there were no sales in the United States of large, dry-cargo freighters comparable to plaintiff's vessels, because of the general requisition of the use of ocean-going freighters by the War Shipping Administration in April 1942, the Administration's General Order No. 27 of April 23, 1942, prohibiting the sale or charter of such vessels unless approved by the Administrator, and other measures initiated by the War Shipping Administration under the Ship Warrants Act, Merchant Ship Priorities Act, 55 Stat. 591, as amended, 50 U.S.C.A.Appendix, § 1281 et seq.; repealed July 25, 1947, 61 Stat. 449.

Since there was no free market and no sales at or about the time of the takings of these eight vessels, other relevant data must be viewed and weighed in determining just compensation. United States v. Miller, supra.

The plaintiff contends values of the first eight vessels at the time of their respective takings were the following dollar amounts per deadweight ton:

| | | | |
|---|---|---|---|
| Nebraskan | $135 | Pennsylvanian | $130 |
| Dakotan | 135 | Illinoian | 120 |
| Iowan | 135 | Kentuckian | 130 |
| Nevadan | 130 | Columbian | 120 |

These values were based on the opinions of plaintiff's expert witnesses as to the value of the vessels in April 1941.

The defendant contends that the values of these eight vessels per deadweight ton were:

| | | | |
|---|---|---|---|
| Nebraskan | $52.30 | Pennsylvanian | $39.88 |
| Dakotan | 54.18 | Illinoian | 42.03 |
| Iowan | 55.80 | Kentuckian | 32.42 |
| Nevadan | 58.67 | Columbian | 33.17 |

These values were based on the opinions of defendant's expert witnesses. We do not believe that either of these sets of valuations approximate the values of plaintiff's eight vessels at the time they were taken.

In 1939, before the beginning of the Second World War, there was a surplus of dry-cargo freighters throughout the world. This excess tonnage had the ob-

vious effect of depressing the market values of such vessels. However, as a result of war casualties and restrictions and other factors a shortage of vessels developed so that by the latter part of 1940 it was difficult to obtain shipping space. Early in 1941, ships carried capacity cargoes both outward and homeward.

Until the middle of 1942 losses of cargo vessels exceeded new construction, but thereafter new construction exceeded the losses, and by the middle of 1943 the size of the fleet had been restored to the 1939 level. After the middle of 1943, new cargo ships constructed represented substantial net increases to the world fleet. However, there was no surplus of American freighters during the period of hostilities. By the end of 1944, 74 percent of the War Shipping Administration fleet was being used for Army and Navy cargo; space for the carriage of non-military cargo was allotted by the Division of Allocations of the War Shipping Administration.

In 1939, the earnings of United States-flag freighters in the foreign trades averaged between $10 and $15 per deadweight ton per annum. By the early part of 1941, the peak period of vessel earnings and market values, the plaintiff's vessels and vessels comparable thereto were sometimes earning as high as $84 per deadweight ton per annum, with profits sometimes over $60 per deadweight ton, exclusive of overhead, depreciation, and taxes.

An important factor in determining the value of these eight vessels, of course, is the actual sales price of comparable vessels in the last free market. Smith-Douglas Co. v. United States, 116 F.Supp. 570, 126 Ct.Cl. 758, certio-rari denied 348 U.S. 815, 75 S.Ct. 24. Indeed, this is a good starting point for the making of an intelligent estimate of what these ships would have brought on the dates of requisition, had there been a free market at that time, although this was, in the case at bar, a highly inflated price. In August 1939 one Hog Island freighter, which is a dry-cargo steamer with a deadweight capacity of about 8,000 tons and an average speed of 10 knots sold at a price of $11.62 per deadweight ton. In January and February 1940, three of these vessels were sold at an average price of $42.50 per deadweight ton. In January 1940, plaintiff sold five of its vessels, which were comparable to the eight vessels involved here, at the following prices per deadweight ton: the *Canadian* at $42.83, the *Delawarean* at $46.97, the *Louisianan* at $46.82, the *Indianan* at $45.02, and the *Tennessean* at $41.04. The average price received by plaintiff was $44.53 per deadweight ton, which was a little more than $2 per deadweight ton more than what Hog Island vessels sold for during the same month. From May through December 1940, seven Hog Island freighters were sold at an average price of $59.02 per deadweight ton per ship.

The only private sales of large freighters in the United States market in 1941 were sales of the Hog Island type. A summary of such sales which occurred between January 17 and April 29, 1941, is set forth below. The term "sound condition price," as distinguished from market price, includes the purchase price, any commission or agency fee paid by the buyer, and the cost of any repairs or reconditioning incurred by the buyer to put the vessel in sound operating condition.

| Date of sale | Ship (new name and former name) | Sound condition price | Price per deadweight ton |
| --- | --- | --- | --- |
| Jan. 17 | *Mary Luckenbach* ex-*Black Falcon* ................... | $500,000 | $62.50 |
| Jan. 17 | *Nira Luckenbach* ex-*Gull* ............................ | 500,000 | 62.50 |
| Jan. 29 | *Particia Skakel* ex-*Exchester* ...................... | 575,000 | 71.88 |
| Apr. 7 | *Melvin H. Baker* ex-*Willmoto* ....................... | 709,620 | 88.70 |
| Apr. 29 | *Alcoa Banner* ex-*Sundance* .......................... | 666,250 | 83.28 |
| Apr. 29 | *Alcoa Cutter* ex-*Sacarappa* ......................... | 691,875 | 86.48 |

No repairs were required to place any of these vessels in a sound operating condition with the exception of the *Melvin H. Baker,* on which the buyer expended $54,620 for repairs.

So that, prices rose in a year and a half after the outbreak of the war in Europe from $11.62, a deadweight ton to an average of $86.15.

Although the April 1941 value was highly inflated, still, if plaintiff had been able to sell his vessels for this price at the date of requisition, it would be difficult to refute the statement that it would be unjust to pay it less. But could it have done so, had it been permitted to sell them to anyone other than the United States? Between April 1941 and the dates of requisition, there occurred a series of historic events, which, in our opinion, reduced the values of plaintiffs' vessels below the amounts which plaintiff could have obtained had it sold them in 1941. These events were: the President's Proclamation of May 27, 1941, No. 2487, 55 Stat. 1647, 50 U.S.C.A. Appendix note preceding section 1, declaring the existence of an unlimited national emergency; the introduction and passage of the Ship Warrants Act, supra; the orders and regulations of the Maritime Commission, the War Shipping Administration and other agencies necessary to the successful prosecution of the war; the entrance of the United States into World War II with the conditions which arose out of the necessity for utilizing the Nation's entire merchant fleet for purposes essential to the conduct of the war; and sinkings and other war damage and other conditions which resulted in more frequent and longer layups for repairs, shortage of fuel, delays by convoy operations; longer and in many cases unprofitable voyages, overstraining of machinery, changes in trade services and routings, congestion and delays in loading and unloading, wartime red tape, and inspection and certification in connection with blockades.

As shown in detail in the findings, by 1943 the tonnage of new ships constructed had exceeded the amount destroyed, and from then on our merchant fleet grew further and further beyond what it was in 1939. On January 1, 1945, the Director of War Mobilization and Reconversion reported to the President and Congress that, as against 1,100 seagoing vessels in 1939, we would have at the end of the war 5,700 vessels, including 2,500 Liberty ships, and 2,500 C-type and Victory ships, in addition to 700 old ships built before the war. These new vessels completely outmoded the old ones for peacetime use, although there was use for all ships, both old and new, during the war and for a year or so thereafter.

On the other hand, before the passage of the Ship Warrants Act, and the regulations of the War Shipping Administration, earnings of nearly all vessels were very high; freight rates had risen from $3.25 a ton to $7.50, and in some cases even more. With such rates a purchaser of one of these vessels could probably have recaptured its costs within three or four years.

However, the restrictions imposed by the Ship Warrants Act and the regulations of the War Shipping Administration, and other war conditions, were actually in effect when the ships were requisitioned and these depressed earnings and values, and, so, we must seek to ascertain the value a willing seller and a willing buyer would have been able to agree upon in the light of these restrictions. The following consolidated table presents the facts with regard to each vessel, so far as they can be shown statistically:

## IN RE: SHIPS REQUISITIONED 1942-1945

| Name of vessel | Date of requisition | Age when requisitioned | Deadweight tons | Cargo capacity (cubic feet) | Speed | Horsepower | Daily fuel consumption (barrels) | Cruising radius | Sales early 1940 per deadweight ton |
|---|---|---|---|---|---|---|---|---|---|
| Nebraskan | Dec. 2, 1942 | 30 | 11,960 | 567,240 | 12.2 | 4,000 | 263 | 10,560 | .......... |
| Dakotan | Dec. 12, 1942 | 30 | 10,175 | 461,923 | 12.0 | 4,000 | 229 | 9,200 | .......... |
| Iowan | Dec. 26, 1942 | 28 | 10,175 | 461,923 | 12.0 | 4,000 | 208 | 10,120 | .......... |
| Nevadan | Jan. 7, 1943 | 31 | 10,055 | 575,360 | 11.6 | 3,600 | 238 | 11,050 | .......... |
| Pennsylvanian | June 30, 1944 | 31 | 10,175 | 461,923 | 12.0 | 4,000 | 212 | 9,940 | .......... |
| Kentuckian | June 30, 1944 | 34 | 9,925 | 432,165 | 11.9 | 3,000 | 200 | 16,390 | .......... |
| Illinoian | June 30, 1944 | 26 | 10,820 | 531,105 | 10.8 | 3,300 | 167 | 15,090 | .......... |
| Columbian | Jan. 8, 1945 | 32 | 9,490 | 384,130 | 12.1 | 3,400 | 198 | 19,180 | .......... |
| Hog Island ships | | | 8,000 | | 10.0 | | | | Average, $42.50 |
| 5 of plaintiff's ships | | | | | | | | | Average, $44.50 |

| Name of vessel | Date of requisition | Sales late 1940 per deadweight ton | Sales early 1941 per deadweight ton | Sales Oct. 17, 1941 per deadweight ton | Allowance | Allowance per deadweight ton | Plaintiff claims per deadweight ton | Defendant claims per deadweight ton | Tender by War Shipping Administration |
|---|---|---|---|---|---|---|---|---|---|
| Nebraskan | Dec. 2, 1942 | .......... | .......... | .......... | $894,727 | $74.81 | $135.00 | $52.30 | $62.74 |
| Dakotan | Dec. 12, 1942 | .......... | .......... | .......... | 761,191 | 74.81 | 135.00 | 54.18 | 65.87 |
| Iowan | Dec. 26, 1942 | .......... | .......... | .......... | 778,082 | 76.47 | 135.00 | 55.80 | 70.10 |
| Nevadan | Jan. 7, 1943 | .......... | .......... | .......... | 735,859 | 73.18 | 130.00 | 58.67 | 61.67 |
| Pennsylvanian | June 30, 1944 | .......... | .......... | .......... | 613,145 | 60.26 | 130.00 | 39.88 | 55.62 |
| Kentuckian | June 30, 1944 | .......... | .......... | .......... | 577,635 | 58.20 | 130.00 | 32.42 | 43.53 |
| Illinoian | June 30, 1944 | .......... | .......... | .......... | 663,266 | 61.30 | 120.00 | 42.03 | 54.41 |
| Columbian | Jan. 8, 1945 | .......... | .......... | .......... | 465,000 | 49.00 | 120.00 | 33.17 | 16.21 |
| Hog Island ships | | $59.02 | Average, $78.57 | $84.24 | | | | | |
| 5 of plaintiff's ships | | .......... | .......... | .......... | | | | | |

▇▇▇ In addition, witnesses have testified as to the condition, characteristics, and value of each vessel. We have taken into consideration the general characteristics of each of the vessels, their physical condition, age, depreciation, the earnings before requisition, prospective earnings, and sales prices of comparable vessels in the last free market, the supply and demand for vessels, the operating conditions during the war, the uncertainties of the war, and legislative and administrative restrictions, and have concluded that the amounts set forth below represent what a willing buyer would have given a willing seller for eight of plaintiff's vessels at the time they were taken.

| Name of vessel | Approximate amount per deadweight ton | Value at time of taking |
|---|---|---|
| Nebraskan | $74.81 | $894,727 |
| Dakotan | 74.81 | 761,191 |
| Iowan | 76.47 | 778,082 |
| Nevadan | 73.18 | 735,859 |
| Pennsylvanian | 60.26 | 613,145 |
| Kentuckian | 58.20 | 577,635 |
| Illinoian | 61.30 | 663,266 |
| Columbian | 49.00 | 465,000 |

It will be noted that there are differences in the amount allowed per deadweight ton. This is due to the testimony of the witnesses and other evidence as to the varying characteristics and condition of the several vessels.

We have found a somewhat lower value for the *Columbian* in proportion to the values found for the others. This is partly because when she was taken the end of the war was in sight, and, therefore, the end of her useful life.

▇▇▇ The figures we have adopted do not include any sum for enhancement in value due to the causes that necessitated the taking. As shown in the findings, such enhancement, if any, was negligible.

The foregoing does not apply to the *Mexican* and *Virginian* which were taken when there was a free market, on May 14, 1946 and May 23, 1946, respectively. The plaintiff contends that the values of the *Mexican* and *Virginian* when they were taken were $622,125 and $551,250, respectively, which is $45 per deadweight ton for each. The defendant contends that their values were $268,000 and $252,000, respectively, which is about $19.39 and $20.57 per deadweight ton, respectively.

On March 8, 1946, the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S. C.A.Appendix, § 1735 et seq., was enacted. That statute authorized the Maritime Commission to dispose of war-built merchant vessels to citizens of the United States at a " 'Statutory sales price' " which, in the case of dry-cargo vessels, was 50 percent of the prewar domestic cost. The Act also provided that the statutory sales price was to be depreciated at the rate of five percent per annum from the date of construction of the vessel and permitted the Maritime Commission to make a further deduction of three percent per annum for excessive wear and tear by reason of war service. Floor prices equivalent to 31½ percent of the domestic war cost of the Liberty-type vessels and to 35 percent of the domestic war cost of other dry-cargo vessels were established. In addition, the Act provided that citizens of the United States could buy these war-built vessels at the established prices by making a down payment of 25 percent thereof and paying the balance in twenty annual installments, bearing interest at the rate of 3½ percent per annum.

On April 13, 1946, the Maritime Commission issued its General Order No. 60 promulgating rules and regulations for sales under the Merchant Ship Sales Act of 1946. For the standard Liberty cargo vessel, a ship of 10,800 tons deadweight capacity and a speed of 11 knots, the floor price set forth in the order was equivalent to $50.42 per deadweight ton. For the standard Victory cargo vessel, which was a modern vessel of 10,800 deadweight capacity and a speed of 15.3

knots, the floor price established in the order was equivalent to about $81.40 per deadweight ton.

As a result of the size and composition of the post-war merchant fleet and the passage of the Merchant Ship Sales Act, there was virtually no demand by American ship operators for old, dry-cargo vessels, such as the *Mexican* and the *Virginian* when they were requisitioned in May 1946. There was, however, a market in the United States for the sale of such freighters to foreign buyers.

Included among the sales to foreign buyers were thirteen freighters of over 10,000 tons deadweight capacity, and varying in age from 25 years to almost 43 years at the time of the sales. The sales prices ranged from $240,000 to $445,000 per ship. There were also eleven sales of dry-cargo freighters of more than 9,000 tons deadweight capacity and varying in age from about 25 years to more than 29 years on the dates of sale. The sales prices ranged from $150,000 to $400,000 per ship.

When they were requisitioned, the *Mexican* was more than 39 years old and the *Virginian* was nearly 43 years old. Among the sales to foreign buyers, the vessel which was nearest in age and size to the *Mexican* and *Virginian* was the *President Johnson,* a vessel of 15,167 tons deadweight capacity, which was more than 42 years old at the time of sale. This vessel had originally been a combination passenger-cargo ship, but had been converted to a dry-cargo freighter. She was sold in December 1946 at a price of $240,000.

Among the sales in 1946, there was also the *William Luckenback,* which was comparable in age to the *Mexican* and *Virginian*. She was a dry-cargo freighter of 10,901 tons deadweight capacity and was more than 33 years of age when sold in December 1946. She was sold for a price of $445,000.

In 1946, plaintiff sold five of its dry-cargo freighters to foreign buyers. The *Utahan* was sold in May 1946 at a price of $320,000; the *Kansan* was sold in August 1946 at a price of $350,000; the *Carolinian* was sold in August 1946 at a price of $380,000; the *Arizonian* was sold in October 1946 at a price of $385,000, and the *Georgian* was sold in November 1946 at a price of $360,000.

The prices paid by the foreign buyers in 1946 represented prices for the vessels in their condition at the time of sale without regard to any expenditures required to place them in sound operating condition.

The following table gives the statistics relative to the *Mexican* and the *Virginian* and comparable vessels:

IN RE: SHIPS REQUISITIONED 1946

| Name of vessel | Date of sale | Age when requisitioned | Dead-weight tons | Cargo capacity (cubic feet) | Speed | Horse-power | Daily fuel consumption (barrels) | Cruising radius | Allowance | Plaintiff claims (per vessel) | Defendant claims (per vessel) | 1946 sales price for comparable vessels | Tender by War Shipping Administration |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| President Johnson | December 1946 | 42 | 15,167 | ...... | ...... | 11,000 | ...... | | | | | $240,000 | ...... |
| William Luckembach | December 1946 | 33 | 10,901 | ...... | ...... | 4,000 | ...... | | | | | 445,000 | ...... |
| Plaintiff's vessels: | | | | | | | | | | | | | |
| Utahan | May 1946 | 26 | 10,231 | ...... | ...... | 2,800 | ...... | | | | | 320,000 | ...... |
| Kansan | August 1946 | 28 | 9,460 | ...... | ...... | 3,400 | ...... | | | | | 350,000 | ...... |
| Carolinian | August 1946 | 24 | 10,380 | ...... | ...... | 2,600 | ...... | | | | | 380,000 | ...... |
| Arizonian | October 1946 | 26 | 11,600 | ...... | ...... | 2,600 | ...... | | | | | 385,000 | ...... |
| Georgian | November 1946 | 26 | 11,600 | ...... | ...... | 2,600 | ...... | | | | | 360,000 | ...... |
| Mexican | ...... | 39 | 13,825 | 606,421 | 11.6 | 4,600 | 303 | 10,950 | $320,000 | $622,125 | $268,000 | ...... | $180,830.53 |
| Virginian | ...... | 43 | 12,250 | 642,694 | 12.1 | 5,200 | 306 | 13,500 | 300,000 | 551,250 | 252,000 | ...... | 158,100.53 |

Taking into consideration the general characteristics of the *Mexican* and the *Virginian,* their age, and the sales prices of comparable vessels, we conclude that a willing buyer would have given a willing seller $320,000 for the *Mexican,* and $300,000 for the *Virginian.*

Plaintiff is entitled to recover the sum of $2,510,577.79, representing the balance of just compensation for the taking of each of plaintiff's ten vessels, in the following amounts, which are the amounts we have found to be just compensation for the taking of each vessel, less the amounts already paid:

| | |
|---|---|
| *Nebraskan* | $336,401.50 |
| *Dakotan* | 258,533 50 |
| *Iowan* | 257,024.75 |
| *Nevadan* | 279,184.75 |
| *Pennsylvanian* | 188,712.50 |
| *Kentuckian* | 253,603.50 |
| *Illinoian* | 221,702.00 |
| *Columbian* | 349,614.17 |
| *Mexican* | 184,377.05 |
| *Virginian* | 181,424.07; |

and as compensation for delay in payment, computed at 4 per cent per annum on the amounts set out in findings 48 and 50 from the date of taking of each of the vessels, the *Nebraskan* on December 2, 1942, the *Dakotan* on December 12, 1942, the *Iowan* on December 26, 1942, the *Nevadan* on January 17, 1943, the *Pennsylvanian* on June 30, 1944, the *Illinoian* on June 30, 1944, the *Kentuckian* on June 30, 1944, the *Columbian* on January 8, 1945, the *Mexican* on May 14, 1946, the *Virginian* on May 23, 1946, to the date of payment of 75 per cent of the amount determined by the War Shipping Administration as just compensation, as set out in findings 4 and 5, plus interest on the amounts set out immediately above from the date of the payments made as set out in findings 4 and 5 to the date of the payment of the judgment herein.

Entry of judgment is suspended pending the filing of a stipulation by the parties showing the amount due plaintiff computed in accordance with this opinion.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.